IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Knoxville July 23, 2024

## STATE OF TENNESSEE v. LLOYD ALLARD

**Appeal from the Circuit Court for Stewart County**
**No. 2017-CR-89      Suzanne M. Lockert-Mash, Judge**

_____

### No. M2023-01033-CCA-R3-CD

_____

A Stewart County jury found Defendant, Lloyd Allard, guilty of two counts of aggravated rape of a child, two counts of aggravated sexual battery, and twenty-eight counts of especially aggravated sexual exploitation of a minor. The trial court imposed an effective sentence of 144 years in the Tennessee Department of Correction ("TDOC"). On appeal, Defendant contends: (1) the trial court erred in failing to suppress the entirety of his custodial statement after he invoked his right to counsel; (2) the trial court erred in denying Defendant's motion to suppress evidence on chain of custody grounds; (3) his sentence is excessive; and (4) the evidence produced at trial supported his insanity defense. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which TIMOTHY L. EASTER and TOM GREENHOLTZ, JJ., joined.

Gregory D. Smith, Clarksville, Tennessee (on appeal); Hansel J. McCadams (at trial), Paris, Tennessee; and Stephanie Ritchie-Mize (at pretrial motion hearing), Clarksville, Tennessee, for the appellant, Lloyd Allard.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; W. Ray Crouch, Jr., District Attorney General; and Danielle Bryson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Facts and Procedural History

### A. Background

Defendant was convicted of numerous sexual offenses against his wife's granddaughter; the victim was less than a year old at the time of the offenses.[1] At some point after the offenses, Defendant became the focus of an investigation involving the uploading of child pornography onto the internet. On February 3, 2017, as part of that investigation, local authorities executed a search warrant, seizing electronic items from Defendant's home. Three days later, Defendant was interviewed and made incriminating statements regarding the abuse of his step-granddaughter. Defendant was subsequently indicted in connection to those offenses, and initially entered guilty pleas before the trial court granted Defendant's motion to withdraw the pleas. The case proceeded to trial in March 2022.

### B. Motion to Suppress Statement

On March 7, 2018, Defendant filed a motion to suppress his February 2017 interview with police, arguing his statements were involuntary and obtained in violation of his right to counsel. A hearing on the motion was held March 12, 2018. The only evidence introduced was the recording of Defendant's interview—no witnesses testified. However, the recording of the interview presented at the hearing does not appear in the appellate record. Complicating matters, the trial court and parties' comments at the hearing, notations in the hearing transcript, and the parties' appellate briefs reference the recording alternatively as an "audio recording" and a "video recording." This court filed an order on August 23, 2024, directing the trial court clerk to supplement the record with a video recording of the interview if such a recording existed, but the clerk's response to our order, filed September 9, 2024, indicates no video recording of the interview appears in the trial court record. Thus, this court's analysis of the February 2017 interview and Defendant's issues related to the interview will be based on the audio recording of the interview introduced as an exhibit at trial and appearing in the record on appeal.

Defendant was interviewed by Scott Levasseur, a Detective Lieutenant with the Dickson County Sheriff's Department assigned to investigate child pornography and internet crimes against children within the Twenty-Third Judicial District, and Jason Gillespie, Chief of the Cumberland City Police Department. After being advised of his

---

[1] The indictment alleged that the offenses occurred between July 1, 2012, and April 30, 2013. The victim was born in July 2012.

*Miranda* rights, Defendant signed a waiver of those rights and agreed to speak with the officers. Detective Levasseur told Defendant that the National Center for Missing and Exploited Children ("NCMEC") had received a tip about a person uploading child pornography onto the internet. According to the detective, AT&T, the service provider for to the Internet Protocol ("IP") address purportedly used to upload the images, received a subpoena, and the subpoenaed records indicated the IP address was connected to Defendant. The detective told Defendant that a second NCMEC "hit" indicated someone using Defendant's IP address had uploaded child pornography to a Dropbox online document storage account. Defendant was informed that the police had searched his home and obtained computers.

Detective Levasseur showed Defendant certain photographs of the victim in the case, and the detective told Defendant that the detective knew that Defendant appeared in some of these pictures as well. Defendant acknowledged the victim appeared in the pictures, but he denied appearing in the pictures. The detective then told Defendant that the police were searching for USB drives that had been attached to Defendant's computer; the detective said these drives contained photographs, and he also stated that the police planned on searching Defendant's car and gun safe to find the drives. The detective then asked how old the victim was, to which Defendant replied, "I'd like to talk to my attorney."

Detective Levasseur then told Defendant that certain parts of his body (arms, legs, hands, face, and genitals) would be photographed. The detective also told Defendant that he (Defendant) could say who was in the photo or the detective would ask Defendant's wife. The detective then asked Defendant who appeared in the pictures; Defendant replied he appeared in the photographs, and the actions depicted therein happened only once and occurred approximately five years before the interview. The detective replied that he knew the abuse happened more than once, at which point Defendant again asked for an attorney.[2]

During the approximately seven minutes that followed Defendant's second request for counsel, police took photographs of Defendant pursuant to a search warrant. At the end of the seven-minutes, Detective Levasseur told Defendant that "I understand you lawyered up, but I am really not wanting to destroy your gun safe." In response, Defendant eventually gave the police the combination to his gun safe. About two and a half minutes after the detective made the "I know you lawyered up" comment—and about thirty seconds after Defendant provided the safe's combination—Defendant said, without direct questioning from the detective, "It had to be like three years ago. I've not done it since." The detective responded "huh," or something to that effect. Defendant then said he "just felt awful afterwards," at which point Detective Levasseur stated he could not hear

---

[2] Upon agreement of the parties, the trial court suppressed the portion of the interview referenced in this paragraph.

Defendant because of his hearing aids. Defendant repeated his comment about "feeling awful" then said he felt "horrible, dirty, mean." Defendant told the detective that he did not have any pictures on his computer because he did not want to see anything like that again, and he also insisted there were no photographs in his gun safe. After these comments, the detective replied, "you understand, we gotta do our job," to which Defendant replied that he was not trying to dissuade the police from investigating.

After these comments, Defendant and Detective Levasseur were silent for thirty to forty-five seconds before Defendant asked the detective what would happen next. The detective responded that he was placing Defendant under arrest, the police would execute a search warrant, and the investigation would continue, but the police could not ask Defendant further questions because Defendant requested an attorney and the police would obtain the information they were seeking on their own. Defendant replied that the detective could ask questions, but Defendant knew he could refuse to answer certain questions. The detective then asked if Defendant was waiving his right to counsel, because he had invoked that right previously. Defendant replied that he would waive his right to counsel. After Defendant announced he was waiving that right, he told the detective that the abuse occurred only once while at his house. When asked whether anyone else was involved or knew about what happened, Defendant answered "no." When the detective responded that other child pornography existed on a removable drive that had been connected to the computer recovered from Defendant's home, Defendant denied having such materials. Defendant said he may have looked at such material on another computer that "got fried." The detective again told Defendant that the data on Defendant's computer showed that he (Defendant) had looked at child pornography on his computer that had been accessed from removable drives; specifically, the detective told Defendant the data showed up to 100 images of child pornography acquired from the internet had been reviewed on the computer. The detective again stated that the police knew pictures of the victim had been viewed from removable drives attached to Defendant's computer; Defendant again denied uploading images from a USB drive and denied that pictures of the victim existed on his home computer. Defendant also insisted that he had no idea how he acquired any of the pornographic images he reviewed. Defendant admitted that he had looked at child pornography off and on over a six-to-eight-year period, but claimed he had "been away from it" for a long time.

After the trial court reviewed the police interview, the parties asserted and the trial court agreed that Defendant's statements between his first invocation of his right to counsel and the end of Defendant's being photographed should be suppressed. Defendant argued that the rest of the interview should be suppressed as well, given the relatively short time (approximately ten minutes) between Defendant's invocation of the right to counsel and his subsequent statements to police, that he was in police presence throughout that period and thus felt coerced to speak, and the police's failure to readvise Defendant of his *Miranda*

rights or allow him to speak to an attorney. The State argued that all of Defendant's statements after the police took pictures of his body—statements both immediately before and after Defendant said he would waive his right to counsel—should be admissible because Defendant's statements were voluntary, and Detective Levasseur did not resume questioning Defendant until after he stated he would waive his right to counsel.

The trial court denied Defendant's motion as to Defendant's statements he made after the police took pictures of his body, stating in relevant part:

> I do not see anything that indicated that the officer was initiating or trying to continue any type of conversation. They were merely sitting there. And, at which point in time, [Defendant] just said this, without the officer even asking him anything or whatever. He just, for whatever reason, feeling remorse or fear or whatever, just basically said this is something three years ago, have not done it since or whatever.
>
> At which point, the response from the officer at that point in time was, "I'm sorry, I didn't hear you. My hearing aids. What?" And he made the other statement.
>
> And the officer said, you know, I can't hear you or whatever. And then he asks again about, "Well, what's going to happen with that?" And the officer says, "Well, I'm just doing my job," at that point in time.
>
> After that, the officer basically says, "Wait a minute, wait a minute, you've already said you wanted to have a lawyer." And I think they had that conversation about twice. He said, "I know." And he indicated, he says, "Look, I'll answer—if I don't want to answer the question, I won't answer. I'll waive my right," with that.
>
> So what [the court is] looking at is the fact, in looking at the totality of the circumstances at that point in time, it was the Defendant that initiated conversation. After that, he basically reopened the conversation, you know, carried on a dialogue with the officer, and with that.
>
> So, at this point in time, [the court is] going to say that after he invoked his right to a lawyer, that he initiated on his own the dialogue with this officer. And until the officer got down to, well, you understand we're just trying to do our job or whatever, at 22:28, [Defendant] basically said, this is something three years ago, had not done it or whatever.

And the officer didn't question him about it. He just basically said, all right, I can't hear you, my hearing aids. And he made this other statement, at which point in time, he asked him, initiated, well, what's going to happen after that, and he basically told him.

So [the court is] going to show that he—after asking for a lawyer, then he voluntarily waive[d] his right to the lawyer and engaged in this conversation. So, [the court is] not going to suppress it from 22:28 on further.

The case proceeded to trial in March 2022.

## C. Trial Testimony

Defendant's then-wife, T.M.,[3] had been married to Defendant during the time of the offenses and was still married to him as of trial, but they were separated and their divorce was pending. T.M. testified she had two adult sons from a previous relationship; one of those sons, J.S., lived with Defendant and T.M. during the times of these offenses. J.S.'s daughter is the victim in this case and was born in July 2012. Defendant also had an adult daughter who lived at Defendant's residence during these offenses, along with her son. T.M. testified that Defendant had a "great" relationship with the grandchildren before these offenses occurred.

T.M. said that Defendant served in Army Special Forces for twenty-three years, retiring in 2005. T.M. denied seeing any changes in Defendant's behavior after he returned from deployments, nor did T.M. recall Defendant experiencing blackouts or anger issues. At the time of the criminal offenses, Defendant and T.M. owned four Little Caesar's Pizza franchises in Tennessee and Kentucky. T.M. testified Defendant was often the onsite manager at these stores, and the work there involved high-stress levels. T.M. denied that Defendant ever became confused or disoriented when work became stressful. T.M., acknowledged, however, several incidents indicating anger on Defendant's part. She testified that on one occasion, she drove to one of the Kentucky stores because employees told her Defendant was upset. As T.M. drove Defendant home from this incident, Defendant told her that he was "pissed off and the employees were idiots." T.M. said that on another occasion, Defendant punched the screen of a point-of-sale system at a restaurant and cracked the screen, and in another episode, Defendant punched a metal rack used to hold pizzas and caused a dent. She was unsure whether Defendant had punched holes in

---

[3] To protect the privacy of the victim and her family, the victim's family members, though adults, will be refenced by their initials. The juvenile victim will be referenced as "the victim."

their garage's walls but acknowledged that Defendant often felt anxiety around crowds and fireworks given his past military deployments.

T.M. was not present when the above-referenced search warrant was executed at her home because she and Defendant were in Alabama for a "pinning ceremony" recognizing Defendant's daughter's promotion in the military. During this trip, one of T.M.'s adult sons, who was staying at her residence, called to inform her about the search. T.M.'s son spoke to both Defendant and T.M.; T.M.'s son also sent her a photograph of the search warrant left by the investigating officers. When T.M. asked Defendant about what was going on, Defendant "took his glasses off, and he leaned down towards" her before looking her in the eye and responding, "I don't know. I don't know anything." T.M. recalled that during the rest of the trip Defendant remained calm while T.M. contacted an attorney and their internet service provider.

T.M. acknowledged that a handwritten letter introduced into evidence through a later witness contained Defendant's handwriting. She also identified a blue fitted sheet appearing in a picture later introduced into evidence as being from her home. T.M. testified that at some point after returning home from the Alabama trip, she located a plastic baggie containing "thumb drives" in the breast pocket of Defendant's military dress uniform jacket, which hung in his closet. She also recalled that the pocket contained "white printer paper" with website addresses printed on the paper. She also recalled that her uncle gave her a broken laptop computer that the uncle had found in a detached storage building on her property. T.M. denied having seen this computer before her uncle gave it to her.

Chief Gillespie testified that he collected the broken computer from Defendant's residence. He also recalled that T.M. contacted him about the items she found in Defendant's uniform pocket, including flash drives; the police had looked for the flash drives as part of the search warrant without success. Rather, T.M. gave Chief Gillespie five flash drives after she found them. Chief Gillespie acknowledged that the victim underwent a sexual assault examination at the time police learned about the abuse, but no indications of abuse were discovered. He found this unsurprising given that several years had passed between the abuse and the police's learning about the abuse.

Detective Levasseur was the lead investigator in the case and a computer forensic examiner. He testified that he obtained an "HP All-in-One" computer from Defendant's residence after a search warrant was executed there in February 2017. After making a copy of this computer's hard drive, he found several "thumbnail" images of child pornography on the hard drive. The photographs themselves were not on the hard drive, but based on the data the detective extracted from the hard drive, he learned that the pictures were on USB drives which had been connected to the computer at some point. In their initial search

of the house the police had found a USB "hub" that allowed several USB devices to be attached to the computer at once, but they had not found any USB drives.

Eventually, Chief Gillespie provided Detective Levasseur with the five USB drives T.M. had given to the chief. The detective was able to retrieve files from three of the five drives; these files corresponded to the thumbnails the detective had observed when examining the forensic copy of Defendant's hard drive. Given the nature of the photographs and videos and the fact that Defendant does not challenge the proof establishing the elements of the charged offenses on appeal, this court will not describe these files in detail other than to state that the files depicted a man sexually abusing a small child. As explained later in this opinion, Defendant acknowledged in his trial testimony that he was the adult appearing in the various media files and his step-granddaughter was the victim. The detective testified that based on the data contained in the files, he determined that the files were created on September 4, 2012, December 28, 2012, and January 4, 2013. This was when the victim was less than a year old.

Detective Levasseur did not send the USB drives to the Tennessee Bureau of Investigation crime lab for DNA testing or fingerprint analysis because the drives were found in Defendant's house, and the detective said he expected that Defendant's "DNA [was] going to be on everything." Furthermore, the detective stated that because the USB drives were found in Defendant's military jacket, "[h]is DNA is going to be all over that." To the detective, the important evidence was the "photographic evidence that the offense took place." The portions of the Defendant's interview with the detective not suppressed by the trial court were published to the jury during the detective's testimony.

Defendant testified on his own behalf. After describing in detail his military service, he identified the photographed military dress uniform displayed earlier in the trial as his own. He said that the Russellville, Kentucky Little Caesar's store was "horrible" and caused him stress. Unlike the Tennessee stores, which were profitable, the Russellville store had low sales and "employee problems." Defendant said he never received professional help for his stress-related issues before being arrested because "I was a Green Beret in the Army. I was raised to suck it up and drive on." Defendant agreed with T.M.'s testimony that he broke a computer and dented a pizza tray at work. He stated he did not remember damaging walls using his fists but found himself "standing there with three holes in the garage."

Defendant claimed he was sexually abused by a fourteen or fifteen-year-old boy when he was nine or ten years old. Defendant denied telling anyone about this incident before his arrest or seeking professional help for it.

Defendant acknowledged he and his step-granddaughter appeared in the photographs and videos taken from his computer and introduced into evidence. However, he added, "I can't deny that was my, this face, this body, but it was not me. That was somebody else." He claimed he did not know what happened and did not recall either committing the actions depicted in the photos and videos or recording the photos and videos depicting the sexual abuse. Defendant said that when he first saw this evidence, he was "[h]orrified that I would do that. I couldn't reconcile the fact that I would do something like that knowing that I never would, knowing that I never did anything like that[.]" Defendant acknowledged his interview with Detective Levasseur in which he made incriminating statements, but he insisted he could not recall making that statement. He also admitted his handwriting appeared on a letter written to his daughter telling her about these incidents, but he said he did not recall writing the letter, which read:

> This is the hardest letter I have ever written. I cannot imagine how you felt when you heard. I want you to know this only happened once or twice over four years ago. I wish I could take it back. I've grown a lot since then, but these days—that does not change the past.
>
> My goal now is to put this behind, pay for my sins, and be the father and grandfather you all deserve. I don't know how long I will be gone. I will avoid a trial and plead for mercy before the Court. I want to spare [T.M.], and you, and you all, any more anguish.
>
> If you could find it in your heart to forgive me, I would love mail and maybe a visit. As I'm being held alone, you schedule visits with the shift sergeant. Since the time it all happened, I look at myself with hate and self-loathing and shame.

Defendant acknowledged that the actions depicted in the photos and videos found on his computer were wrong, and said that he always knew they were wrong. He stated that he suffered "blackouts" on eight to ten occasions following his discharge from the military, and he claimed that the victim's abuse, the photographs and video recordings of the abuse, and the transfer of those files onto his computer must have occurred during these blackouts. However, he testified that he did not know whether he suffered any blackouts during his overseas military deployments, and he did not think caring for an infant caused him stress.

Before trial, Defendant had filed a notice of intent to pursue an insanity defense and he called Donald Gold, a licensed psychologist, as a witness. The doctor was accredited by the trial court as an expert in the field of adult psychiatry and performed a psychiatric evaluation of Defendant. Dr. Gold met with Defendant for six to eight hours over the

course of three sessions. Dr. Gold reviewed Defendant's various medical and military records and said that Defendant disclosed that he had been sexually abused by an older child when Defendant was ten years old. Dr. Gold said that Defendant had told him about his "blackouts" and that some of these occurred during Defendant's time in the military. Dr. Gold testified that based on his evaluations, he did not believe Defendant's blackouts "relate[d] to alcohol or drug use, or partial seizures, or any such thing as that." Dr. Gold opined that Defendant was not malingering during his evaluations.

When asked whether Defendant suffers from a severe mental disease or defect, Dr. Gold responded that Defendant "had a number of comorbid conditions that warranted . . . individual diagnoses, each one." Dr. Gold first diagnosed Defendant with "major depressive disorder, recurrent, moderate." Based on Defendant's violent outbursts, Dr. Gold also diagnosed Defendant with "[i]ntermittent explosive disorder." Dr. Gold diagnosed Defendant with pedophilia; although Defendant told Dr. Gold that his (Defendant's) sexual attractions were "largely" toward persons aged between seventeen and eighteen, and that he had engaged in sexual contact with adult prostitutes while in the military, Dr. Gold concluded that Defendant's "old records . . . including the alleged incident . . . qualified [Defendant] for the diagnosis of pedophilia." Dr. Gold further diagnosed Defendant with post-traumatic stress disorder ("PTSD"). However, Dr. Gold acknowledged that Defendant's pedophilia, intermittent explosive disorder, and PTSD did not affect Defendant's ability to appreciate the nature and wrongfulness of his acts.

Dr. Gold testified that given Defendant's past panic attacks, Dr. Gold surmised after his first visit that Defendant "had possible dissociative identity disorder. . . . I wasn't totally convinced of it, but I thought it raised real possibilities." In Dr. Gold's subsequent visits, Dr. Gold diagnosed Defendant with dissociative amnestic disorder and PTSD. Dr. Gold's diagnosis of the dissociative amnestic disorder resulted from Defendant's being "shown the photographs, and he recognized himself and the child, but he had no recollection of it, he just had to look at the pictures and believe that . . . it happened, that he was guilty[.]" Dr. Gold also testified Defendant told him he did not remember making the statements to police. Dr. Gold explained that Defendant exhibited a "good" and a "bad" or "dark" side. The Defendant's good side showed him to be "the good soldier, the good businessman, the good husband, the good father." The "good" Defendant, Dr. Gold explained, "found it disgusting when he saw the pictures." Conversely, Defendant's "dark" side, "when given free rein behaved in a very different way but was unbeknownst to [Defendant]."

When asked whether Defendant, when suffering from dissociative identity disorder, could appreciate the nature and wrongfulness of his acts, Dr. Gold replied:

If the testimony and the reports of the patient are true, then the behaviors that were proven to have occurred were totally antithetical to the normal personality and values of the patient.

And so it's as though the dark side, if he had that compartment, was functioning without the restraint of conscious or normal values and wouldn't have had grossly alternate behavior if they were not being guided by values and conscious and empathy.

Dr. Gold added:

The impression I got from the whole history, including the secreting of—apparent secreting of some of the computer evidence—was that the dark side did appreciate that this is something that would not be accepted elsewhere but did not seem to be something that troubled that second or alternate personality.

However, Dr. Gold also said that he never observed a "second personality" when interviewing Defendant, nor had he encountered a "second personality" when assessing persons with dissociative personality disorders in the past. Further, Dr. Gold acknowledged that he had never previously testified that a person's associative personality disorder "went to a person's ability to appreciate the wrongfulness" of one's actions.

In rebuttal, the State offered the testimony of forensic psychologist Edward Kovach, who formerly worked in the sex offender treatment program at TDOC's Lois Deberry Special Needs facility and at Middle Tennessee Mental Health Institute before retiring to private practice. Dr. Kovach's evaluation of Defendant resulted from Dr. Kovach's meeting with Defendant approximately twice per week over a three-and-a-half-week period. Dr. Kovach said he met with Defendant ten to fifteen times total in both individual and group settings.

Dr. Kovach diagnosed Defendant with unspecified depressive disorder and PTSD, and also recognized Defendant had a history of substance abuse and sleep apnea. Dr. Kovach concluded these diagnoses would not have affected Defendant's ability to appreciate the nature or wrongfulness of his acts, observing that Defendant:

was highly trained in the military to tolerate and cope with stress. And I'm sure that it was very stressful on him, and it did result in PTSD symptoms. So in that respect, it affected him in coping with stress, but did not affect him in terms of his—compromising his ability to understand the nature or wrongfulness of his—of this offense.

- 11 -

Specifically, Dr. Kovach testified that Defendant admitted to him that sexual offenses against children were wrong.

Dr. Kovach observed that the facts of the offenses showed there was "a good deal of planning and compiling pornography and isolating [the victim] in order to commit" the crimes. The psychologist also opined that Defendant's "secreting" the USB drives on which the offending evidence was found "would suggest . . . [Defendant's] understanding of the wrongfulness of the offenses."

Dr. Kovach said that the treatment team with which he worked in analyzing Defendant—a team which included a psychiatrist, a nurse, and a social worker—did not diagnose Defendant with dissociative identity disorder. Dr. Kovach said that a dissociative identity disorder involved "disruption of identity characterized by two or more distinct personality states," and Defendant did not exhibit those symptoms "to any significant extent, very isolated, if that." Dr. Kovach also administered malingering testing to Defendant, and Defendant's scores on Dr. Kovach's tests "had a clear marked[-]out significant elevation for a malingering index." Dr. Kovach said that even if Defendant exhibited an "alternate personality," it was "within, certainly, the realm of possibility that they could still appreciate the wrongfulness and commit the acts."

The jury found Defendant guilty as charged of all counts submitted to it for consideration.

### D. Sentencing Hearing

At the sentencing hearing, the trial court observed that per statute, it was required to sentence Defendant as a Range III offender for his convictions for aggravated rape of a child, a Class A felony. *See* Tenn. Code Ann. § 39-13-531(b) (2006).[4] The court sentenced Defendant as a Range I, standard offender, for his convictions for aggravated sexual battery and especially aggravated sexual exploitation of a minor, both Class B felonies.

At the sentencing hearing, the State introduced the presentence report into evidence, and Defendant testified on his own behalf. The State sought application of several sentencing enhancement factors in Defendant's case. The State requested the enhancement factor found in Code section 40-35-114(4), "A victim of the offense was particularly vulnerable because of age or physical or mental disability[.]" The trial court found this factor applied because the victim "was an infant in diapers" and therefore unable to resist

---

[4] The Tennessee General Assembly has since amended the sentencing requirement for an offender convicted of the aggravated rape of a child.

Defendant's actions. The State also sought, and the trial court found applicable, the factor provided in Code section 40-35-114(7), that "The offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement[.]" The court found applicable the factor in Code section 40-35-114(14), that "The defendant abused a position of public or private trust[;]" the court found the "private trust" provision applicable because Defendant was the victim's step-grandfather and the victim's was "left in [Defendant's] custody."

Defendant sought application of the mitigating factors from Code section 40-35-113(1) ("The defendant's criminal conduct neither caused nor threatened serious bodily injury") and (8) ("The defendant was suffering from a mental or physical condition that significantly reduced the defendant's culpability for the offense"). The trial court acknowledged that there was no proof presented that the victim suffered any bodily injury, but the court observed that the offenses were not discovered until many years after the photographs and videos depicting the abuse were produced. Accordingly, the court did not assign much weight to that mitigating factor. Regarding Defendant's claim that he was suffering from a mental or physical condition, the court, based on the trial testimony and the court's questioning Defendant at the sentencing hearing, stated that it did not find credible Defendant's claims that he did not remember these actions or his alternate personality committed them. The court also stated it did "not find [Defendant's] expert to be very credible in regard to his testimony about [Defendant] having that type of mental illness." The court instead accredited Dr. Kovach, who concluded at trial that Defendant's depressive disorder did not affect Defendant's ability to know the wrongfulness of his actions. Accordingly, the court did not give any weight to the second proposed mitigating factor.

Based on its findings and consideration of the principles of sentencing, the trial court sentenced Defendant to sixty years which was the maximum sentence for a Range III offender convicted of a Class A felony[5] on each of Defendant's two aggravated rape of a child convictions. The court imposed sentences of twelve years, the maximum sentence for a Range I offender convicted of a Class B felony,[6] for each of Defendant's two aggravated sexual battery convictions and Defendant's twenty-eight especially aggravated sexual exploitation of a minor convictions.

The trial court ordered the two aggravated rape of a child sentences and the two aggravated sexual battery sentences to be served consecutively to each other. The court based the consecutive imposition of the sentences on Tennessee Code Annotated section

---

[5] *See* Tenn. Code Ann. § 40-35-112(c)(1).
[6] *See* Tenn. Code Ann. § 40-35-112(a)(2).

40-35-115(b)(5):

> The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts, and the extent of the residual, physical, and mental damage to the victim[.]

It imposed Defendant's twelve-year sentences for each count of especially aggravated sexual exploitation of a minor concurrently with each other and concurrently with the other four convictions, for an effective sentence of 144 years. The court noted specifically the "damage done to this family," the close familial relationship between Defendant and the victim, the length of time over which the offenses were committed, and the time elapsed between the offenses and their discovery. The court labeled the case as "one of the wors[t] [it had] ever seen, to take this baby and do that." Accordingly, the court ordered the alignment of the sentences as set forth above.

Defendant now timely appeals.

## II. Analysis

### A. Admission of Defendant's Custodial Statement

Defendant contends the trial court erred in admitting certain portions of his custodial interview to police which he made after invoking his right to counsel. The trial court concluded that the statements Defendant made after invoking his right to counsel resulted from Defendant's voluntarily choice to speak to police; Defendant argues this conclusion was erroneous because the police coerced Defendant into making these statements by showing him photographs of the victim's abuse and forcing him to submit to photographs of his naked body. The State responds that the trial court properly concluded Defendant's latter statements were voluntary and not coerced.

On appeal, a trial court's factual findings on a motion to suppress are conclusive unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). These include questions of credibility, the weight and value of the evidence, and resolution of conflicting evidence, and we will uphold the trial court's findings unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). However, we review the trial court's application of the law to the facts de novo. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

Both the Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution protect a person against compelled self-incrimination. The Supreme Court has held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). These procedural safeguards require an accused to be advised, prior to a custodial interrogation, that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* "Pursuant to *Miranda*, custodial interrogation entails 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *State v. Goss*, 995 S.W.2d 617, 628 (Tenn. Crim. App. 1998) (quoting *Miranda*, 384 U.S. at 444). The protections provided through *Miranda* apply "when the defendant is in custody and is subjected to questioning or its functional equivalent." *State v. Walton*, 41 S.W.3d 75, 82 (Tenn. 2001) (emphasis added) (citing *Rhode Island v. Innis*, 446 U.S. 291 (1980)). There is no dispute that in this case Defendant was subject to a custodial interrogation.

The State may not use an accused's statements from a custodial interrogation unless: (1) the accused has been previously advised of his constitutional rights to remain silent and to an attorney, and (2) the accused knowingly, voluntarily, and intelligently waives those rights. *See Miranda*, 384 U.S. at 444. Whether the accused's *Miranda* waiver is voluntarily, knowingly, and intelligently made is determined by the totality of the circumstances under which the right was waived. *See State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992). The waiver must be "made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000) (citing *State v. Stephenson*, 878 S.W.2d 530, 544-45 (Tenn. 1994)). The State bears the burden of proving a knowing, intelligent, and voluntary waiver by a preponderance of the evidence. *State v. Bush*, 942 S.W.2d 489, 500 (Tenn. 1997).

The Supreme Court also has held that a confession that is the product of coercive state action is involuntary. *See, e.g.*, *Colorado v. Connelly*, 479 U.S. 157, 163-64, (1986); *see also* State *v. McKinney*, 669 S.W.3d 753, 767 (Tenn. 2023) (The Tennessee Supreme Court held that "voluntariness and *Miranda* waiver are distinct inquires, carry different evidentiary ramifications, and require separate analyses"). At a suppression hearing, the State must prove the voluntariness of a confession by a preponderance of the evidence. *See State v. Stamper*, 863 S.W.2d 404, 405-06 (Tenn. 1994) (citing *Lego v. Twomey*, 404 U.S. 477, 486-87 (1972)). Tennessee's Constitution provides additional protection, as the "test of voluntariness for confessions under article I, § 9 . . . is broader and more protective of

- 15 -

individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citing *State v. Stephenson*, 878 S.W.2d 530, 544 (Tenn. 1994)). A confession may be considered voluntary if it is not the product of "any sort of threats or violence, . . . any direct or implied promises, however slight, nor by the exertion of any improper influence." *State v. Smith*, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). However, "[a] defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense." *State v. Berry*, 154 S.W.3d 549, 577 (Tenn. 2004) (citing *Smith*, 933 S.W.2d at 455). Rather, the essential question is "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . ." *State v. Kelly*, 603 S.W.2d 726, 728 (1980) (quoting *Rogers v. Richmond*, 365 U.S. 534, 544 (1961)).

Courts look to the totality of the circumstances to determine whether a confession is voluntary. *See Smith*, 933 S.W.2d at 455. In *State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996), the Tennessee Supreme Court identified a non-exclusive list of factors for courts to consider in determining the voluntariness of a confession:

> The age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

(citations omitted).

When a suspect invokes his right to counsel under the Fifth Amendment, the suspect may not be "subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). In *Edwards,* the Supreme Court essentially established a "second layer of prophylaxis for the *Miranda* right to counsel: Once a suspect asserts the right, not only must the current interrogation cease, but he may not be approached for further interrogation 'until counsel has been made available to him . . . .'" *McNeil v. Wisconsin,* 501 U.S. 171, 176–77 (1991) (quoting *Edwards,* 451 U.S., at 484–85). This has been interpreted to mean that counsel must be present. *Minnick v. Mississippi,* 498 U.S. 146 (1990). If the police subsequently initiate an encounter with a custodial suspect in the absence of counsel, the suspect's

statements are presumed involuntary and therefore inadmissible as substantive evidence at trial even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards. This is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey,* 494 U.S. 344, 350 (1990).

As previously noted, the record concerning this issue is limited to the audio recording of the interview introduced as a trial exhibit, arguments made at the suppression hearing and testimony offered at trial. In denying Defendant's motion to suppress, the trial court referred to things it had seen on the video, including when one of the officers had left the room. We acknowledge that the video recording could have offered more insight into the police interaction with Defendant, including such factors as the size of the interview room, the relative positions of the officers and Defendant, the number of officers present during the interview and photographing of Defendant, and the parties' nonverbal interactions after Defendant invoked his right to counsel. However, the video recording of the interview does not appear in the record, and based on the available evidence, we agree with the trial court on this issue. We conclude Defendant voluntarily and without coercion reversed his invocation of his right to counsel and spoke with police.

Here, the record reflects that Defendant invoked his right to counsel approximately twelve-and-a-half minutes after the interview began. The interviewing officers spoke briefly with Defendant after he invoked his right to counsel, but they stopped once Defendant again invoked that right.[7] The officers then spent five to ten minutes photographing Defendant's body pursuant to a search warrant. The interviewing officers then mentioned to Defendant that although they knew he had invoked his right to counsel, they wanted to obtain the combination to Defendant's gun safe to avoid destroying it. Defendant eventually gave the detectives the combination. Less than forty-five seconds after giving the officers the combination, Defendant began making incriminating statements without prompting by the detectives, including, "it had to be like three years ago. I've not done it since," and, "Just felt awful afterwards. . . . Horrible, dirty, mean." The detectives asked no follow-up questions to these comments, but Defendant did—He asked the officers "what happens now[?]" The officers told him he would be arrested, his house would be searched, and the investigation would continue, but they specifically told Defendant they could not ask him additional questions because he had requested an attorney. It was at this point that Defendant waived his right to counsel and allowed the officers to resume questioning, with Defendant specifically acknowledging he could choose not to answer certain questions. Reviewing the totality of the circumstances surrounding the exchange, we see no coercion of Defendant into making his later statements or waiving his right to counsel after previously invoking it. Defendant's choices

---

[7] As stated above, this portion of Defendant's statement was suppressed.

- 17 -

to do so were voluntary, and the limited interactions by the officers after Defendant invoked his right to counsel—photographing Defendant and asking Defendant for the combination to his gun safe—could not be deemed the functional equivalent of interrogation, as one could not reasonably conclude those actions were designed to provoke incriminating responses from Defendant. Thus, the trial court did not err in concluding Defendant's responses were voluntary and not coerced.

Even if the trial court erred in admitting Defendant's statements, such error would be harmless, as there was sufficient other evidence to establish Defendant's guilt beyond a reasonable doubt. Defendant testified at trial and acknowledged he was the person depicted in the media abusing the victim. The pictures and videos were found on electronic equipment found in Defendant's residence, with the USB drives being found in the pocket of Defendant's military uniform jacket. Defendant also wrote a letter acknowledging his guilt, and this letter was introduced at trial. Thus, Defendant is not entitled to relief on this issue.

## B. Chain of Custody

Defendant next contends the trial court abused its discretion in admitting the USB drives Defendant's wife found inside his military uniform because there was no chain of custody "linking the USB drives to [Defendant] because the USB drives were not found by police in two (2) searches of the Allard home." The State replies that the trial court did not abuse its discretion because the chain of custody was sufficiently established and the issues identified by Defendant relate to the weight of the evidence, not its admissibility. We agree with the State.

This court reviews chain of custody challenges under an abuse of discretion standard. *State v. Cannon*, 254 S.W.3d 287, 295 (Tenn. 2008) (citing *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000) and *State v. Beech*, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987)). A reviewing court should uphold a trial court's ruling unless the trial court "applies an incorrect legal standard, . . . reaches an illogical or unreasonable decision, or . . . bases its decision on a clearly erroneous assessment of the evidence." *State v. Mangrum*, 403 S.W.3d 152, 166 (Tenn. 2013) (citations omitted).

Here, Tennessee Rule of Evidence 901(a) is the applicable rule, providing that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Our supreme court repeatedly has held that "'as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence *or* establish an unbroken chain of custody.'" *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000) (emphasis added) (quoting *State v. Holbrooks*, 983

S.W.2d 697, 701 (Tenn. Crim. App. 1998)); *see also Cannon*, 254 S.W.3d at 296. The chain of custody rule "is designed to insure 'that there has been no tampering, loss, substitution, or mistake with respect to the evidence.'" *Id.* (quoting *State v. Braden*, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)). Although the State should sufficiently establish each "link" in the chain of custody, it is not required to prove the identity of tangible evidence "beyond all possibility of doubt." *Cannon*, 254 S.W.3d at 296. The State need not exclude every possibility of tampering, and an "item is not necessarily precluded from admission . . . if the State fails to call all of the witnesses who handled the item." *Id.* (citing *Scott*, 33 S.W.3d at 760, and *State v. Johnson*, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1984)). Indeed, "when the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence." *Id.*

At trial, T.M. testified that she found a plastic baggie containing USB drives inside the breast pocket of Defendant's military uniform, which hung inside a closet in the couple's home. Chief Gillespie testified that T.M. contacted him about the drives, and he obtained the drives from her. Detective Levasseur testified that he then retrieved the drives and obtained photographs[8] from some of them. The detective testified that some of the images he obtained from the drives were original versions of "thumbnail" images he had seen on Defendant's computer when the detective conducted an earlier forensic search of it. Both Defendant and T.M. testified that they confirmed the victim's identity and the location of the photographs, and Defendant acknowledged appearing in the photographs taken from the drives. This evidence was sufficient to establish the chain of custody of the USB drives.

In his brief, Defendant argues that the drives were inadmissible because the police did not find them in their earlier searches of his home and because Defendant testified he was unaware of "how the thumb drives came into existence, where the thumb drives came from, or how the thumb drives got into the pocket of [his] old military uniform." However, such issues went to the weight of the evidence and not its admissibility. Because the trial court did not abuse its discretion in admitting this evidence, Defendant is not entitled to relief on this issue.

### C. Insanity Defense

Defendant contends the evidence produced at trial was insufficient to support his convictions. But instead of arguing the State failed to establish the elements of the

---

[8] Although a search warrant regarding the police search of the USB drives does not appear in the appellate record, Defendant's pretrial motion to suppress the USB drives states that the police obtained a search warrant to search the USB drives.

conviction offenses beyond a reasonable doubt, Defendant argues he "established a valid claim for the insanity defense." We disagree.

Tennessee Code Annotated section 39-11-501(a) provides:

> It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of such defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

Because insanity is an affirmative defense, the State does not have the burden of proving sanity beyond a reasonable doubt. *State v. Flake*, 88 S.W.3d 540, 551 (Tenn. 2002).

"Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Holder*, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (citing *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 901 n.2 (Tenn. 1992)). Furthermore:

> "In determining whether a defendant is insane, a jury is entitled to consider all the evidence offered, including the facts surrounding the crime, the testimony of lay witnesses, and expert testimony." *Flake,* 88 S.W.3d at 556. The jury is to determine the weight and value to be given to expert testimony regarding the defendant's claim of insanity. *Id.* at 554. "Where there is a conflict in the evidence, the trier of fact is not required to accept expert testimony over other evidence and must determine the weight and credibility of each in light of all the facts and circumstances of the case." *Id.* The jury "may not arbitrarily ignore [expert] evidence," but it is "not bound to accept the testimony of experts where the evidence is contested." *Id.* at 556.

*State v. Colvett*, 481 S.W.3d 172, 196-97 (Tenn. 2014) (alteration in original).

The standard for reviewing a jury's rejection of an insanity defense is the reasonableness standard. *Flake*, 88 S.W.3d at 554. A jury verdict rejecting an insanity defense is reversible only "if, considering the evidence in the light most favorable to the prosecution, no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence." *Id.* Appellate courts will not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are

resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see also State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

Here, both sides presented accredited witnesses to offer expert testimony on their extensive testing of Defendant. Dr. Gold, Defendant's expert, concluded Defendant suffered from dissociative personality disorder; however, Dr. Gold testified that while Defendant's "dark side" personality would readily commit actions that Defendant's "good" personality would find wrong or disgusting, his "dark side" personality still recognized the actions were wrong. A person's recognizing the wrongfulness of his actions but choosing to commit the actions anyway does not constitute an inability to appreciate the wrongfulness of one's actions, as is required to sustain an insanity defense. Conversely, Dr. Kovach, testifying for the State, opined that Defendant did not suffer from dissociative personality disorder and was able to appreciate the wrongfulness of his actions at the time he committed them.

Examining the opinions of both experts in the light most favorable to the State, we conclude that Defendant has failed to establish that "no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence." *Flake*, 88 S.W.3d at 554. The jury in this case reviewed the two expert opinions, and through its verdict accredited Dr. Kovach's conclusion that Defendant appreciated the wrongfulness of his actions. This was the jury's prerogative. Such a conclusion was reasonable, and as stated above, we do not "reweigh the evidence or reassess credibility determinations. These tasks are within the province of the jury." *Id.* at 556. Defendant is not entitled to relief on this basis.

## D. Sentencing

Defendant contends that the trial court "erred by ordering maximum sentences for [Defendant] that run consecutive when a mitigating factor existed and consecutive sentencing far exceeds [his] life expectancy." The State counters that the trial court did not abuse its discretion in sentencing Defendant. We agree with the State.

"[S]entences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10.

Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as

well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Id.* at 698-99 (quoting Tenn. Code Ann. § 40-35-210(e)). However, these statutory enhancement and mitigating factors are advisory only. *See* Tenn. Code Ann. § 40-35-114; *see also Bise*, 380 S.W.3d at 701; *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343 (quoting Tenn. Code Ann. § 40-35-210(d)).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant made on the defendant's own behalf about sentencing; and (8) results of the validated risk and needs assessment conducted by the Department of Correction and contained in the presentence report. Tenn. Code Ann. § 40-35-210(b); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the length of a term to be imposed. Tenn. Code Ann. § 40-35-103.

The abuse of discretion standard adopted in *Bise* also applies to the imposition of consecutive sentences, "giving deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013); *see also* Tenn. R. Crim. P. 32(c)(1) (stating that the trial court, in ordering consecutive sentencing, "shall specify the reasons for this decision"). The trial court must find by a preponderance of the evidence that one of the statutory classifications for consecutive sentencing exists. *See* Tenn. Code Ann. § 40-35-115(b).

On appeal, Defendant does not contest the trial court's application of the sentence enhancement factors or its finding that consecutive sentencing was warranted based on Defendant's multiple acts of sexual abuse against the child victim. Nor does Defendant argue the court ignored the principles of sentencing or imposed a sentence outside the appropriate ranges for each offense. Rather, Defendant argues the court erred by not applying (or applying no weight to) the mitigating factor concerning Defendant's mental state, not applying weight to the factor regarding the victim's lack of injury, and imposing

a sentence that far exceeds Defendant's life expectancy.  However, Defendant's arguments do not entitle him to relief.  The trial court's findings at the sentencing hearing show the court considered carefully all evidence presented regarding Defendant's purported mental state and, after such consideration, concluded that Defendant's evidence and arguments did not support the application of the mental state mitigating factor.  The court's consideration of this factor and refusal to apply it after such consideration was within its discretion, and we will not disturb that discretion on appeal.  "[M]ere disagreement with the trial court's weighing of the properly assigned enhancement and mitigating factors is no longer a ground for appeal." *Bise*, 380 S.W.3d at 706. Thus, to the extent Defendant takes issue with the weight attributed to these mitigating factors, he has no basis for an appeal, being limited to whether the sentence is inconsistent with the purposes and principles of sentencing.  Similarly, the court's giving little weight to the lack of injury to the victim was within its discretion, and on appeal we will not disturb this finding.

Defendant's argument that his effective 144-year sentence is excessive because it exceeds his life expectancy is also unavailing.  The consecutive sentencing factor identified by the trial court was fully supported by the evidence, and there is no statutory authority or case law limiting the length of a total sentence that a court may impose resulting from consecutive sentencing.  The sentences imposed by the trial court were within the statutory limits, and the total effective sentence was imposed pursuant to the sentencing principles, so the court did not abuse its discretion in imposing the sentence.  Furthermore, we note that this court has concluded, "the fact that the sentence imposed by the trial court exceeds the life expectancy of the appellant does not, *per se*, make the sentence oppressive or constitute an abuse of discretion."  *State v. Taylor*, No. 02C01-9501-CR-00029, 1996 WL 580997, at \*23 (Tenn. Crim. App. Oct. 10, 1996) (citing *State v. Tyler*, 840 P.2d 413, 435 (Kan. 1992)).

Accordingly, we conclude the trial court did not abuse its discretion in sentencing Defendant to an effective term of 144 years.

## III. Conclusion

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
MATTHEW J. WILSON, JUDGE

- 23 -